581 A.2d 857

Charles BOCK

v.

INSURANCE COMMISSIONER OF the STATE
OF MARYLAND.

No. 153, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Nov. 13, 1990.

Michael B. Green, Towson, for appellant.

Meg Lynn Rosthal, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before GARRITY, ALPERT and ROBERT M. BELL, JJ.

ALPERT, Judge.

We are called upon to decide whether the mailing of a protest against the non-renewal of an automobile insurance policy will satisfy the requirement that the protest be "filed" with the Insurance Commissioner.

Charles E. Bock, appellant, appeals from a judgment by the Circuit Court for Baltimore City, the Hon. Robert I.H. Hammerman presiding, in which the court affirmed the Maryland Insurance Commissioner's decision to deny Bock's request for a hearing on the nonrenewal of his automobile insurance policy. We reverse for the reasons set forth below.

## FACTS

On September 14, 1988, Nationwide Insurance Company (Nationwide) sent to Charles and Janice Bock a notice that the company would not renew their automobile policy and that the current policy would end effective 12:01 a.m. on November 6, 1988. The "right of protest" incorporated into the notice instructed the Bocks that they could protest the proposed nonrenewal if they signed two copies of the notice and sent them to the Insurance Commissioner (the Commissioner) within 30 days after their receipt of the notice. The notice further indicated that the Commissioner could not consider the protest unless the Bocks filed it within the 30 day time limit. It also informed the Bocks of their right to request a hearing if the Commissioner concluded that their protest was without merit. The Bocks again had 30 days from the receipt of the Commissioner's determination to request a hearing.

On September 19, 1988, Bock allegedly signed two (2) copies of the nonrenewal notice and sent them via regular mail to the Commissioner at 501 St. Paul Place, Baltimore, Maryland 21202, as per Nationwide's instructions in the

nonrenewal notice. Neither Nationwide nor the Commissioner ever corresponded with Bock because the Commissioner allegedly never received the protest that Bock claims he sent. On November 8, 1988, Bock was involved in an at-fault accident with his automobile. Bock called the company that day to report the accident and the company informed him that it had cancelled his policy on November 6, 1988.

Bock immediately called the Commissioner, who advised Bock that there was no record that he had filed a protest. After a series of discussions between Bock and the Commissioner, Bock sent a certified letter to the Commissioner and to Nationwide. In the letter, Bock explained that he had mailed his protest on September 19, 1988, and had assumed that Nationwide would continue his coverage until the Commissioner reached a decision on the protest. On December 14, 1988, an insurance investigator, Waldemar Bradshaw, wrote to Bock explaining that the Insurance Division could not act on the protest because the Commissioner had not received it within the 30 days after Bock's receipt of the nonrenewal notice.

On April 11, 1989, Bock's attorney wrote a letter to the insurance investigator outlining the sequence of events that had occurred. On April 26, 1989, the insurance investigator informed Nationwide that Bock had filed a protest and that the protest had stayed the nonrenewal action. On May 16, 1989, however, a staff specialist, John V. Quinn, retracted the stay that the insurance investigator issued in his letter of April 26. The staff specialist explained that the investigator mistakenly believed that Bock's policy still was in effect when the investigator issued the stay. The staff specialist noted that under section 240AA(c)[sic],[1] "[a] protest duly filed shall stay the proposed action of the insurer pending a final determination." Because the Commissioner had not received Bock's protest within the 30 day time limit,

---

1. Although the staff specialist cited this subsection in his letter, the correct citation is to section 240AA(e).

there was no protest "duly filed." Thus, the Commissioner had no authority to act on the matter or to hold in effect a terminated policy. The staff specialist did suggest that if Bock could show that he timely mailed the protest, the Insurance Division would pursue the matter with Nationwide; the staff specialist further indicated that he had asked Nationwide to respond to Bock's letter of April 11, 1989 and that he would inform Bock of the results.

The Commissioner never reported to Bock any response by Nationwide. On June 1, 1989, Bock's attorney formally requested a hearing pursuant to section 240AA(f) of article 48A of the Maryland Annotated Code. The staff specialist responded on June 23, 1989, again stating that the Commissioner was unable to grant or deny a hearing pursuant to the statute because the Commissioner has no authority over a protest unless it is duly filed. The staff specialist reiterated that if Bock could substantiate that he mailed the protest, the Insurance Division would pursue the matter with Nationwide.

Bock appealed from the Commissioner's decision as reflected in his letter of June 23, 1989 to the Circuit Court for Baltimore City. The lower court affirmed the Commissioner's decision for two reasons. The court first found that "the state of [the] law is that the protest must be filed with the Commissioner within a prescribed period of time and received by them physically." Although the court accepted Bock's proffer that he mailed the protest, the court went on to conclude that "the clear evidence ... is that the protest was never received.[ ] I think this rebuts the presumption that there might be delivery of the mail indicated. It is for this reason that I affirm the [Commissioner's] decision." Bock appeals to us from the lower court's decision.

## ISSUE

Bock asks us to decide whether the lower court erred by affirming the Commissioner's decision to refuse a hearing when there was an unrebutted presumption from the evi-

dence that Bock had satisfied the requirements of Md.Ann. Code, art. 48A, § 240AA(d) and (e), which would have stayed Nationwide's nonrenewal of the policy.

## THE CONFLICT

The focal point of the dispute between Bock and the Commissioner lies in the language of section 240AA(d) and (e) of article 48A of the Maryland Annotated Code (1986). The two subsections read as follows:

(d) *Protest.*—An insured shall have the right to protest the proposed action of the insurer by signing 2 copies of the notice and *sending* them to the Commissioner within 30 days after receipt[2] of the notice. The Commissioner shall, upon receipt of a protest, notify the insurer of the filing of the protest. (emphasis added).

(e) *Stay of Proposed Action.*—A protest *duly filed* shall stay the proposed action of the insurer pending a final determination by the Commissioner, and the insurer shall maintain in force the same coverage and premium in effect on the day the notice of proposed change was sent until the final determination is made, provided that any lawful premium due or becoming due prior to the determination is made. (emphasis added).

Based on this language, we believe that the legislature ideally intended section 240AA(d) and (e) to operate as follows.

Subsection (d) gives the insured the right to contest the insurer's proposed course of action—either cancellation or renewal—so long as the insured signs 2 copies of the notice (the protest) and sends (mails) them to the Commissioner within 30 days after the date of mailing of the notice. Note that under the language of subsection (d), the insured need only *send* the protest within the 30 day time period, *i.e.*, a protest postmarked within that time should meet the statu-

---

**2.** Effective July 1, 1989, the legislature substituted "the date of mailing" for "receipt." Act of May 19, 1989, ch. 367, 1989 Md.Laws 2694. The change is inapplicable to this case.

tory requirement. The subsection assumes that the Commissioner eventually will receive the protest. Upon receipt of the protest, the Commissioner must notify the insurer "of the filing."

Subsection (e) then provides that the insured's "duly filed" protest, *i.e.,* a protest which the Commissioner has received, will automatically stay the insurer's proposed course of action. Consequently, the insurer must maintain the same coverage and premium that were in effect when the insurer sent the notice until the Commissioner reaches a final determination. The insured must pay any premium due or that becomes due before the Commissioner has resolved the matter.

In his argument, Bock points to subsection (d) as being dispositive of the issue. Bock submits that the right to protest arises when the insured signs 2 copies of the nonrenewal notice and sends them to the Commissioner within the 30 day time period. He contends that once he properly sent (mailed) the protest, *i.e.,* he put the protest into an envelope, sealed it, placed a stamp on it, addressed it to the Commissioner's correct address, and placed it in a U.S. mailbox, a presumption arose that the protest reached the Commissioner within the regular time for delivery. If unrebutted, Bock argues that the presumption of receipt should be enough to give the Commissioner the authority to act on Bock's behalf and to trigger the automatic stay provision of subsection (e).

The Commissioner, on the other hand, believes that subsection (e) controls the disposition of the issue. The Commissioner interprets "duly filed" to mean that the insured must not only sign two copies of the notice and send them to the Commissioner within the 30 day time period, but also that the Commissioner must physically receive the protest before the Commissioner has the authority to take any action on the insured's behalf and before it can trigger the automatic stay provision.

730

## DEFINITIONS

Black's Law Dictionary states that "send" means to deposit in the mail ... with postage ... provided for and properly addressed and in the case of an instrument to an address specified thereon...." BLACK'S LAW DICTIONARY 1221–22 (5th ed. 1979). It defines "mailed" as when a letter is "properly addressed, stamped with the proper postage, and deposited in a proper place for receipt of mail," *id.* at 858, so "send" and "mail" have the same meaning. The case law supports Bock's contention that "the testimony of a witness that he properly addressed, stamped and mailed a letter raises a presumption that it reached its destination at the regular time and was received by the person to whom it was addressed." *Kolker v. Biggs,* 203 Md. 137, 144, 99 A.2d 743 (1953).

Black's Law Dictionary also defines "file: [a] paper is said to be filed when it is delivered to the proper officer and received by him to be kept on file...." BLACK'S LAW DICTIONARY 566 (5th ed. 1979). The Court of Appeals applied that definition in *Levy v. Glens Falls Indemnity Co.,* 210 Md. 265, 273, 123 A.2d 348 (1956) ("a paper is said to be 'filed' when it is delivered to the proper officer and received by him to be kept on file"). *See also American Casualty Co. v. Dep't of Licensing and Regulation Insurance Division,* 52 Md.App. 157, 162, 447 A.2d 484 (1982). The court also recognized the distinction between "mailing" and "filing" in *Renehan v. Public Serv. Comm'n,* 231 Md. 59, 63, 188 A.2d 566 (1963), when it stated that "[t]he mailing of the appeal to the Clerk is not made the equivalent of filing it with him." Thus, the Commissioner is correct in the definition and the application of the term "file."

It is impossible to discern from the language of the statute alone whether the legislature intended "mailing" or "filing" to control in a situation such as this one; in fact, it is likely that the legislature never anticipated such a situation. The language of these two subsections, by itself, will not resolve the issue.

## LEGISLATIVE INTENT

We must look for direction to the legislature's intent in enacting section 240AA.

> In ascertaining and effectuating the legislative intent, the statute's legislative history, administrative interpretations, purpose, and its language taken in context and in relation to all its provisions must be considered. If the words used in the statute are of doubtful meaning, the court in determining the legislative intent will not only consider their usual and literal meaning, "but their meaning and effect considered in the light of the objectives and purposes of the enactment and the consequences resulting from one meaning rather than another meaning...." Statutes should be construed reasonably and with reference to the purposes to be accomplished. Statutory construction which leads to results that are unreasonable, illogical or inconsistent with common sense is to be avoided.

*Woodmont Country Club v. Montgomery Co.*, 61 Md.App. 229, 236, 486 A.2d 218 (1985) (citations omitted).

The Court of Appeals and the Maryland Attorney General previously have examined the history and purpose of section 240AA.[3] In *Gov't Employees Ins. Co. v. Insurance Commissioner*, 273 Md. 467, 480, 330 A.2d 653 (1975), the Court of Appeals noted that the legislature enacted section 240AA as part of "a sweeping overhaul of the [State's] automobile liability insurance laws...." The Court explained that section 240AA provides the insured with procedural protections that complement the substantive limitations which section 234A imposes on an insurer in the event that the insurer decides to cancel or refuses to renew an insured's automobile policy. *Id.* at 483, 330 A.2d 653.

---

**3.** Section 212 of article 48A of the Maryland Annotated Code states that "[t]he purpose of the subtitle is to regulate trade practices in the business of insurance ... by defining, or providing for determination of, all such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the insurance trade practices so defined or determined."

Section 234A prohibits an insurer from discrimination in underwriting and provides, in part, that:

No insurer ... shall cancel or refuse to underwrite or renew a particular insurance risk or class of risk for any reason based in whole or in part upon race, color, creed, sex, or blindness of an applicant or policyholder for any arbitrary, capricious, or unfairly discriminatory reason.

Md.Ann.Code, art. 48A, § 234A(a) (1986). An insurer who cancels or refuses to renew must do so by "the application of standards which are reasonably related to the insured's economic and business purposes." *Id.*

The Attorney General has interpreted these substantive and procedural safeguards as having a dual purpose. 71 *Op.Att'y Gen.* 173, 175 (1986). First, they protect the insured against arbitrary cancellation or nonrenewal by the insurer. *Id.* Second, they further the public policy objective of compulsory liability insurance.[4] *Id.* The Attorney General further noted that

[c]ontinuous insurance coverage is essential to the effectiveness of a law mandating automobile insurance in fixed amounts. An insured must receive adequate notice of a proposed cancellation or nonrenewal so that replacement insurance coverage can be obtained, unnecessary gaps in coverage avoided, and the protection available to innocent third party accident victims preserved.

"In addition, the statutory termination provisions allow the insured to avoid the consequences flowing from a lapse in coverage, such as suspension of vehicle registration. For these reasons, the very same bill that enacted mandatory vehicle liability insurance—Chapter 73, Laws of Maryland

---

4. Since 1972, Maryland has had a compulsory motor vehicle insurance law, which requires the owner of any vehicle registered in the State to maintain vehicle liability insurance for defined amounts. If the insurance lapses while the vehicle is registered in the State, there is an automatic suspension of the vehicle registration. These requirements protect the public by ensuring that vehicle operators and owners have the financial ability to pay for damages caused by motor vehicle accidents. 71 *Op.Att'y Gen.* 173, 175–75 (1986).

1972—also amended the Insurance Code to add the procedural protections of § 240AA." *Id.* at 176.

The legislature thus enacted section 240AA to protect both the insured and the general public.

The Maryland Code is replete with instances in which the legislature has used the phrase "shall file." *See, e.g.,* Md. Tax–Gen. Code Anr. § 10–805 (1988 & Supp.1990) ("shall file"); Md.Cts. & Jud.Proc.Code Ann. § 5–101 (1984) ("shall be filed"); *see also id.* § 12–201 ("may file"). The legislature must have been aware of its prior use of this language when it enacted section 240AA. Presumably, then, if the legislature had intended the insured *to file* a protest, it would have used the phrase "shall file" or "may file" in subsections (d) and (e). The legislature's choice of the word "send" in section 240AA(d), when it previously has specified "file" in so many other statutes, leads us to believe that the legislature intended to authorize something less than physical receipt to give rise to the right to protest.

## PRESUMPTION OF RECEIPT

In Maryland, a finding that an individual properly mailed a letter raises a presumption that the letter "reached its destination at the regular time and was received by the person to whom it was addressed." *Border v. Grooms,* 267 Md. 100, 104, 297 A.2d 81 (1972) (quoting *Kolker v. Biggs,* 203 Md. 137, 144, 99 A.2d 743 (1953)). Testimony that the addressee did not receive the letter does not conclusively rebut the presumption of receipt.[5] Instead, the trier of fact

---

**5.** At least one court has found that there is a difference between recording and receipt. *See Waite v. Doe,* 204 N.J.Super. 632, 499 A.2d 1038, 1040 (1985). In *Waite,* an attorney timely sent a complaint to the court clerk via certified mail. After the statute of limitations had run, the attorney discovered that the clerk had no record of the filing. The Superior Court held that the complaint was timely filed because the attorney sent it by certified mail 15 days before the statute of limitations had run. The court noted that "[t]here is a difference between recording and receipt. Proof that there was no recording does not by itself constitute proof, sufficient to overcome the presumption, that there was also no receipt." *Id.*

must consider that evidence along with all of the other evidence in the case to determine whether the individual mailed the letter and whether the addressee subsequently received it. *Id.*

The legislature specifically prescribed the type of mail that *an insurer* must use when sending particular documents to the insured. Section 240AA(b) directs the insurer to send notice of a cancellation or nonrenewal of an insured's policy by certified mail. Section 240B(c) provides that the duties imposed on an insurer by that section will be "deemed discharged if the insurer shows that its established procedures would have resulted in placing in the United States mail of the notice of renewal premium due, provided there is no showing that in fact the notice was not placed in the mail." Presumably, the legislature instituted these different requirements according to the amount of protection it believed that the insurer and an insured needed in a given situation. That is, the repercussions would be greater if the insured did not timely receive a cancellation or nonrenewal notice than if the insured did not timely receive a notice that the renewal premium was due.

By contrast, section 240AA at most directs the insured to "send" the protest—in other words to put it in the regular mail. Although the insured has the option of using certified, registered, or express mail, or even the option of hand delivering it to the Commissioner, we believe it is just that—an option. We disagree that the insured must bear "the vagaries of the mail," if the insured sends a protest via regular mail and it then is lost because of human error. Had Bock sent his protest by certified or registered mail, we think that the Commissioner would be hard pressed to argue in the face of documentary evidence that Bock lost his right to protest merely because there was no physical receipt of the protest. We believe that an insured is entitled to the same protection under section 240AA(d) that section 240B(c) affords an insurer who sends a renewal notice via regular mail. That is, if the insured can demonstrate that he or she properly mailed the protest, and there

is no showing to the contrary, then the right to protest arises and the procedural protections of section 240AA(e) and (f) will apply. Bock met all of the statutory requirements that give rise to the right to protest once he properly mailed the protest.

Bock indicated that he was prepared to testify that he properly had mailed the protest. In rebuttal, the Commissioner asserted that there was no record of the protest. The Commissioner's counsel, however, stated that "the Commissioner has no reason to doubt the veracity of Mr. Bock that he did, in fact, mail this protest." The trial court ultimately accepted Bock's proffer.

The language of subsection (d) would seem to guarantee Bock the right to protest once he signed 2 copies of the notice and sent them to the Commissioner within the statutory time period. Consequently, we hold that Bock retained the right to protest, if in fact he mailed the protest, even though it later was lost. Under the circumstances of this case, Bock is entitled to a hearing on the question of whether he properly mailed the protest. If the Commissioner finds, as a matter of fact, that Bock did properly mail the protest, then the Commissioner should conduct a hearing on Nationwide's nonrenewal of the automobile insurance policy and order that upon payment of the premium the non-renewal is stayed retroactively. To hold to the contrary would be counter to the language of section 240AA(d) and to the legislature's purpose in enacting section 240AA, *i.e.*, to protect an insured against an insurer's improper cancellation or nonrenewal of an automobile insurance policy and to further the public policy objective of compulsory liability insurance.

The Court of Appeals' reasoning in *D & Y, Inc. v. Winston*, 320 Md. 534, 578 A.2d 1177 (1990), supports our conclusion in this case. At issue in *D & Y, Inc.* was the interpretation of Md.Real Prop.Code Ann., § 10–102(f) [6]

---

6. Section 10–102(f) provides:

(1988), which requires the seller in a land sales transaction to record the contract within 15 days of its execution and which provides a penalty for the failure to do so. *Id.*, at 535, 578 A.2d 1177. The seller in *D & Y, Inc.* recorded the contract one day late. *Id.* After the buyer had occupied the property and made payments for almost two years, the buyer then demanded that the seller return all of the payments because "the statute prescribed that penalty for late recording." *Id.*

The Court examined the language of the statute and concluded that it was unclear "whether the right to rescind exists only if exercised before recording is accomplished, or is a right that may be exercised at any time following the [seller's] failure to accomplish a timely recording." *Id.*, at 536, 578 A.2d 1177. Stating that courts should avoid the construction of a statute which is "unreasonable, illogical, unjust, or inconsistent with common sense ...," (citations omitted) *id.*, the Court of Appeals quoted 2A Sutherland Statutory Construction § 45.12 (4th ed. 1984) for the principle that the "unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result." *Id.*

The Court of Appeals observed that if the buyer's interpretation of the statute was correct, then a buyer who knew that the seller had recorded a contract late could occupy the property indefinitely, yet retain an absolute right to rescind the contract at any time and recoup all of the payments made. *Id.*, at 537, 578 A.2d 1177. In the Court's view, that

---

Within 15 days after the contract is signed by both the vendor and purchaser, the vendor shall cause the contract to be recorded among the land records of the county where the property lies and shall mail the recorder's receipt to the purchaser. This duty of recordation and mailing of receipt shall be written clearly or printed on the contract. Failure to do so, or to record as required under this section within the time stipulated, gives the purchaser the unconditional right to cancel the contract and to receive immediate refund of all payments and deposits made on account of or in contemplation of the contract.

interpretation "produce[d] an absurd and unjust result." *Id.* Instead, the Court held that the buyer retained the right to rescind the contract and recover all payments if the seller did not record the contract within the 15 day period *only if* the buyer made that election and communicated it before the seller actually recorded the contract.

In this case, we think that an equally absurd and unjust result would occur if we adopted the Commissioner's interpretation of section 240AA(d), *i.e.,* the Commissioner must physically receive a protest before the *right* to consideration of the protest arises. Under the Commissioner's interpretation, an insured who mails a protest via certified, registered, or express mail—all of which produce documentary evidence of a mailing—would not have a right to protest under section 240AA(d) because the Commissioner had not physically received the protest. We do not believe that the legislature ever intended such a result. Consequently, the only other reasonable interpretation is that an insured's right to protest arises under section 240AA(d), even if the protest later is lost, so long as the insured can establish that he or she properly mailed the protest.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTION TO REMAND THE CASE TO THE INSURANCE COMMISSIONER FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.